UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
at LEXINGTON


CIVIL ACTION NO. 5:08-CV-302-KKC

MERIDIAN CITIZENS MUTUAL
INSURANCE COMPANY,                                                       PLAINTIFF

v.                                         **OPINION AND ORDER**

STEPHEN THOMAS HORTON,                                            DEFENDANT

\* \* \* \* \* \* \* \* \* \*

This matter is before the Court on cross motions for summary judgment filed by Plaintiff

Meridian Citizens Mutual Insurance Company ("Meridian") and Defendant Stephen Thomas

Horton ("Horton").  Rec. 14, 15.  For the reasons set forth below, the Court will deny Meridian's

motion for summary judgment and grant Horton's motion in part.

**I.      FACTUAL BACKGROUND**

**A. Basic Facts**

On August 7, 2006 Meridian issued a property insurance policy to Horton, which

provided coverage for his residence at 800 Agawan Road, Winchester, Kentucky and for other

locations identified in a schedule attached to the policy.  Rec. 1, Complaint ¶ 5.  On December 6,

2007, Horton submitted a claim for the loss of cattle, which he alleged were taken by two of his

former employees.  *Id.* at ¶ 9.  Horton's employees sold the stolen cattle for over $85,000 at

Bluegrass Stockyards East, LLC ("the stockyards").  *Id.* at ¶ 10.  After their actions were

discovered, Horton's former employees pled guilty to taking the cattle from three farms owned

1

by Horton personally or by Horton's company, AG Insurance, Incorporated ("AG") AG. *Id.* at ¶¶ 11-12.

The parties do not dispute that Horton required his former employees to live on his farms. *Id.* at ¶ 13.  While residing on Horton's farms, the employees' responsibilities included working as herdsmen and general farm laborers and they were occasionally authorized by Horton to transport cattle to the stockyards.  *Id.* at ¶ 14.  Horton also provided them with keys to the gates of the farms from which the cattle were taken.  Horton retained the only other set of keys.  *Id.* at ¶ 15.  Horton also acknowledges giving his employees keys and access to the truck used for transporting cattle to the stockyards. *Id.* at ¶ 16.  Finally, the parties agree that Horton's employees were never authorized to sell cattle on their own initiative or to collect the proceeds from cattle sales.

**B. Meridian's denial of Horton's claim and the Meridian Policy**

Meridian doesn't dispute the fact that Horton's employees took  the cattle.  Also, it does not dispute the number or the value of the missing cattle.  *Id.* at ¶ 19.  However, on July 8, 2008, Meridian informed Horton that his claim for coverage was being denied because "[a]ccording to the policy, while a theft of cattle is covered, a loss by wrongful conversion or embezzlement is not covered."  Rec. 25, Exh. 2 at 2.

The Meridian insurance policy provides coverage under Section I - Property Coverage, as follows:

> **Coverage E - Blanket Farm Personal Property Coverage and Coverage F - Scheduled Farm Personal Property Coverage**
>
> We cover "farm personal property" usual and incidental to a farming operation, if shown in the Declarations of this policy and while on an "insured location.

2

    **1.**      The following items of "farm personal property" are also covered away from an "insured location":

      . . . .

      **b.**      "Livestock," except while:

            **1)**      In the custody of a common or contract carrier;

            **2)**      At public stock yards, sales barns, or sale yards; or

            **3)**      At packing plants or slaughterhouses.

Rec. 1, Complaint, Exh. 1 at 16.  Covered losses fall within the section of the insurance policy entitled "Perils Insured Against."  Horton made his claim under the "theft" peril.  Rec. 1, Complaint ¶ 21.  The "Perils Insured Against" section provides as follows:

> **Basic Perils**
>
> We will pay for direct loss or damages to property described for those perils listed below, and subject to all conditions, exclusions, and special limits described in Section I of this policy.
>
> . . . .
>
> **9.**      **Theft,** including attempted theft and loss of property from a known place when it is likely that the property has been stolen.  This peril does not include loss:
>
>     . . . .
>
>     **e.** Due to wrongful conversion or embezzlement.

Rec. 1, Complaint, Exh. 1 at 18.

In denying coverage, Meridian has asserted that because Horton's loss resulted from "wrongful conversion" or "embezzlement" by his former employees, it is not covered.  Rec. 1, Complaint ¶ 23.  In the event that this Court finds that the loss is covered, Meridian argues that a separate deductible should be applied to each separate "theft."  Rec. 1, Complaint ¶ 26.  The relevant deductible policy provision states:

> **4.**      **Deductible.**  We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the applicable deductible shown in the Declarations.  We will then pay only the amount of loss or damage in excess of that deductible up to the limit of liability.  This condition does not apply to specified coverages stated in the policy.

3

Rec. 1, Complaint, Exh. 1 at 23.  The applicable deductible is $1000.

In addition to opposing Meridian's motion for summary judgment, Horton has filed his own motion asserting that he is entitled to summary judgment because the insurance policy is ambiguous or in the alternative provides coverage under the "theft" peril.  Rec. 15.  Horton also asserts that because the cattle were stolen through a series of thefts which were part of one scheme, the should only be applied once.  Finally, Horton asserts that Meridian breached the contract by failing to pay his covered loss and that he is entitled to prejudgment interest.  *Id.* at 21, 23-24.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The movant "[bears] the initial responsibility of informing the district court of the basis for [their] motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the other party's claim.  *Id.* at 322-25.

Once the movant meets this burden, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  Moreover, the evidence must be sufficient to allow a jury to reasonably find in favor of the non-

4

moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d

202 (1986).  In considering a motion for summary judgment, the Court must view the facts and

draw all inferences therefrom in the light most favorable to the non-moving party.  *60 Ivy Street*

*Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

## III.   ANALYSIS

Because this action is founded on diversity jurisdiction, the Court will apply Kentucky

law in interpreting the insurance policy at issue.[1]  *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598

(6th Cir. 2003).  Under Kentucky law, the interpretation of an insurance policy is a question of

law.  *Kemper Nat'l Ins. Co. v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 871 (Ky. 2002).

## A. Whether the insurance policy provides coverage?

Under Kentucky law, "[w]here an exclusion is susceptible to two reasonable

interpretations, the interpretation favorable to the insured is adopted."  *St. Paul Fire & Marine*

*Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 226 (Ky. 1994).  In interpreting

insurance contracts, the Kentucky Supreme Court has set forth certain "cardinal principles"

providing that:

> (1) the contract should be liberally construed and all doubts resolved in favor of the
> insureds; and, (2) exceptions and exclusions should be strictly construed to make
> insurance effective."

*Ky. Farm Bureau Mut. Ins. Co. v. McKinney*, 831 S.W.2d 164, 166 (Ky. 1992).  Nevertheless, an

insured may not create ambiguities where none exist and the Kentucky Supreme Court has

indicated that:

---

[1] In their motions for summary judgment, Meridian and Horton agree that Kentucky law governs the
interpretation of this insurance contract.

the rule of strict construction against an insurance company certainly does not mean that every doubt must be resolved against it and does not interfere with the rule that the policy must receive a reasonable interpretation consistent with the parties' object and intent or narrowly expressed in the plain meaning and/or language of the contract.  Neither should a nonexistent ambiguity be utilized to resolve a policy against the company.  We consider that courts should not rewrite an insurance contract to enlarge the risk to the insurer.

*St. Paul Fire*, 870 S.W.2d at 226-27.  An insurance contract may only be found ambiguous "if a reasonable person would find it susceptible to different or inconsistent interpretations." *Cantrall Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W. 3d 381, 385 (Ky. Ct. App. 2002).

Horton contends that the language in the insurance policy is ambiguous because the terms "theft," "wrongful conversion" and "embezzlement" are undefined and a reasonable insured would not be able to distinguish between "thefts" generally which are covered, and "wrongful conversions" or "embezzlements," which are not.  Meridian responds that the policy is unambiguous and clearly precludes coverage for specific kinds of "theft" including "wrongful conversion" and "embezzlement."  Meridian claims that because Horton entrusted his former employees with caring for the daily needs of the cattle, the resulting "thefts" are not covered.

Meridian initially directs the Courts attention to *Aetna Casualty & Surety Co. v. Salyers*, 294 Ky. 826 (1943) for the proposition that insurance companies may provide general "theft" coverage while excluding coverage for certain kinds of "theft."  In *Salyers*, the insurance policy at issue did not expressly provide "theft" coverage.  In looking at the policy language, the court found that it was broad enough to provide such coverage.  *Id.* at 827.  However, the policy expressly excluded coverage for "[l]oss or damage due to: Wrongful Conversion, Embezzlement or Secretion by a mortgagor, vendee, lessee or other person in lawful possession of the insured property under a mortgage, conditional sale, lease or other contract or agreement..." *Id.* at 829.

6

In *Salyers*, the insured was interested in selling his vehicle and voluntarily transferred it to John Blue, despite Blue's representations that he could not complete the sale without his employer's authorization. *Id.* at 828. One week after Blue was permitted to take possession of the vehicle, he informed Salyers that he was still awaiting his employer's authorization to complete the sale. *Id.* When Blue advanced Salyers ten dollars towards the purchase price, he was allowed to retain possession of the vehicle while awaiting his employer's authorization to consummate the sale. *Id.* However, no further payments were made and Blue disappeared with the vehicle. *Id.* In reviewing the terms of the insurance policy, the Court found that the "list of exclusions clearly brought Blue within the category of guilty actors for whose acts and conduct the defendants were not liable." *Id.* at 830. The Court also rejected Salyers' argument that Blue did not begin with lawful possession of the vehicle because Salyers, as the insured, was in a better position than the insurance company to determine to whom he should have entrusted the car. *Id.* at 831.

This Court finds that *Salyers* does not mandate finding in Meridian's favor because its facts are distinguishable from the facts in this case. First, *Salyers* did not address arguments by the insured that the policy at issue was ambiguous. Second, in *Salyers*, the insurance policy contained language explaining the "wrongful conversion" and "embezzlement" exclusions so that a reasonable insured should have understood that coverage was not provided for "thefts" by persons put in "lawful possession" of the insured property through a mortgage, conditional sale, lease, or other agreement. Here the "wrongful conversion" and "embezzlement" exclusions contain no additional language explaining the "wrongful conversion" and "embezzlement" exclusions to indicate to Horton that "thefts" by employees were not covered. Finally, in *Salyers*

7

the insured voluntarily transferred possession of his vehicle to Blue.[2]  As a result, that court

found that Blue's conduct was clearly within the language of the exclusion because Salyers

voluntarily relinquished possession of the vehicle to him.  Here, Horton never transferred

possession of the cattle to his employees.  The cattle appear to have remained on his farms and in

his possession at all times.  Because the Court finds that *Salyers* is not dispositive of the issues

presented in this case, it will proceed to consideration of whether the insurance policy is

ambiguous.

The Meridian policy does not define the terms "theft," "wrongful conversion" or

"embezzlement."  Where terms in insurance policies are undefined, Kentucky courts typically

refer to dictionary definitions to give the terms their "ordinary meaning as persons with the

ordinary and usual understanding would construe them."  *See, e.g.*, *Ayers v. C&D Gen. Contrs.*,

237 F. Supp. 2d 764, 769-70 (W.D. Ky. 2002).[3]  Consequently, the Court will consult dictionary

definitions to determine whether an ordinary person of the usual understanding would be able to

meaningfully distinguish between these terms.

---

[2] Meridian argues that Horton was aware of a general risk that his cattle could be stolen by others which is why he required his employees to live on his farms.  Meridian argues that in doing so he was in a better position than it to determine whether his employees were appropriately put in this position of trust.  Meridian draws this argument from *Salyers* where in response to an argument that Blue did not begin with lawful possession of the automobile, the Court explained that:

> Since the owner of the insured automobile has the exclusive right to determine the one with whom he will entrust the possession of his insured property, and who presumptively possesses information as to the risk so assumed with opportunities to withhold the transfer of possession for any moral hazard incurred, therefore the loss should fall on him rather than on his insurer who possesses no opportunities to ascertain such facts.

294 Ky. at 831.  However, this reasoning is unpersuasive in this case where Horton never transferred possession of the cattle to his employees.

[3] The reliance on dictionary definitions has been extended by Kentucky courts to include online dictionaries.  *See, e.g.*, *Auto Owners Ins. Co. v. VFW Post 5906*, 276 S.W.3d 298, 301 (Ky. Ct. App. 2009)(utilizing Webster's Online Dictionary to define "business" which was not defined in the applicable insurance policy).

8

Merriam-Webster's Online Dictionary defines "theft" as "the act of stealing; specifically; the felonious taking and removing of personal property with intent to deprive the rightful owner of it" and "an unlawful taking (as by embezzlement or burglary) of property."  In reviewing this definition, a reasonable person of average intelligence would clearly understand that "theft" is the stealing or wrongful taking of another's property.  *See Fidelity & Guaranty Fire Corp. v. Ratterman*, 262 Ky. 350, 353 (Ky. Ct. App. 1936).  Meridian has not disputed that Horton's former employees committed  "theft" when they took his cattle.  As a result, the primary question for this Court is whether the dictionary definitions of "wrongful conversion" and "embezzlement" would allow a reasonable person of ordinary understanding to differentiate between those specific types of "thefts" which are not covered from "thefts" generally which are.

Merriam-Webster defines "conversion" as "the act of converting; the process of being converted;...something converted from one use to another," or "to appropriate without right."[4] To "appropriate" means to "take exclusive possession of" or "to take or make use of without authority or right."  Thus "wrongful conversion" refers to the unlawful taking or use of the property of another without right.  In reviewing the dictionary definitions of "theft" and "wrongful conversion" the Court finds that it would be difficult for an ordinary person to distinguish between the two terms.

This difficulty is further illustrated by definitions contained in Black's Law Dictionary. Black's Law Dictionary defines "theft" as "the felonious taking and removing of another's personal property with the intent of depriving the true owner of it; larceny."  BLACK'S LAW

---

[4] The Oxford English Dictionary similarly defines "conversion" as "the action of (illegally) converting or applying something to one's own use."

DICTIONARY (8th ed. 2004). Generally, "theft" is "any act or instance of stealing, including larceny, burglary, embezzlement, and false pretenses." *Id.* "Conversion" on the other hands is defined as "the wrongful possession or disposition of another's property as if it were one's own; an acts or series of acts of willful interference, without lawful justification, with an item of property in a manner inconsistent with another's right, whereby that other person is deprived of the use and possession of the property." *Id.* Because the Court finds that an ordinary person would not be able to distinguish between "theft" and "wrongful conversion" the policy language is ambiguous and coverage should not be precluded by the "wrongful conversion" exclusion.[5]

The Court has also considered whether an ordinary person of reasonable intelligence could distinguish between "theft" and "embezzlement." Merriam-Webster Online Dictionary defines "embezzlement" as "to appropriate (as property entrusted to one's care) fraudulently to one's own use."[6] To "appropriate" means "to take or make use of without authority or right." This definition indicates that embezzled property often is "entrusted"[7] to the care of another person. In reviewing these definitions, the Court finds that an ordinary person of average intelligence would not be able to distinguish between "thefts" generally which are covered and "embezzlements" which are not. According to Black's Law Dictionary indicates that

---

[5] Distinguishing between "wrongful conversion" and theft also is not made easier by looking to Kentucky case law. To plead a claim for conversion under Kentucky law, a party must allege that: (1) it had ownership rights in certain property; (2) that the Defendant wrongfully took or disposed of the property; and (3) that the plaintiff suffered damages. *See, e.g.*, *Pioneer Res. Corp. v. Nami Res. Co., LLC*, 2006 U.S. Dist. LEXIS 43192, at * 34 (E.D. Ky. 2006). These elements indicate the similarity between "conversion" and "theft."

[6] The Oxford English Dictionary similarly defines "embezzlement" as the "fraudulent appropriation of entrusted property."

[7] When one person "entrusts" property to another, they confer a trust on them, usually by "deliver[ing] something in trust to" them or "commit [their property] to another with confidence." MERRIAM-WEBSTER ONLINE DICTIONARY.

10

embezzlement is most commonly associated with a fiduciary relationship.[8]  In reviewing these definitions, the Court finds that a person of the usual understanding would believe that property is embezzled where a fiduciary or similar relationship exists whereby property is entrusted from one person to another.  Employers typically confer a certain level of trust on their employees.  Often, they give employees keys to their business and provide them with access to their goods.  This trust and access sometimes makes it easier for employees to steal from employers than from third parties.  However, the Court finds that an ordinary person of the usual understanding would not comprehend that all employee "thefts" are  "embezzlements" as Meridian appears to argue.

Neither party has cited a decision by a Kentucky court considering whether an insurance policy providing coverage for "theft" and excluding coverage for "wrongful conversion" and "embezzlement" is ambiguous where none of these terms have been defined.  However, Horton has presented decisions from other jurisdictions finding policies containing similar undefined terms ambiguous.  Because those decisions are based on insurance law principles similar to those applicable under Kentucky law, they support a finding that the insurance policy in this case is ambiguous and should be construed as providing coverage.

In *Kozak v. United States Fidelity & Guaranty Co.*, 355 N.W.2d 362, 363 (Wis. Ct. App. 1984), the court addressed whether "an exclusionary clause excepting 'wrongful conversion and embezzlement' from "theft" coverage was ambiguous when applied to a farm tenant who made unauthorized sales of cattle and appropriated the proceeds.  *Id.*  The court initially explained that although the insurance company may have intended to exclude the farm tenant's conduct from

_____

[8] Black's defines  "embezzlement" as "the fraudulent taking of personal property, with which one has been entrusted...[especially] as a fiduciary."  BLACK'S LAW DICTIONARY (8th ed. 2004).

coverage, the policy had to be construed based on what an ordinary person would have understood it to mean. *Id.* at 364. The court also explained that the insurer easily could have defined the exclusions to clarify what kinds of "thefts" it intended to exclude. *Id.* Second, the court consulted dictionary definitions and found that the ordinary meanings of "wrongful conversion" and "embezzlement" were insufficient to distinguish them from "theft" generally. *Id.* Finally, the court was unable to find state statutes or case law adequately distinguishing "theft" from "wrongful conversion" and "embezzlement." *Id.* As a result, the Court held that a reasonable person of ordinary intelligence would not understand that a policy providing coverage for "theft" would "exclude loss resulting when a farm employee makes an unauthorized sale of animals and appropriates the proceeds for his own use" under the "wrongful conversion" and "embezzlement" exclusions. *Id.*

Given the close similarity between the facts in *Kozak* and this case and based on the reasoning supporting that court's decision, this Court finds *Kozak* highly persuasive. Here, Meridian had ample opportunity to define the terms in its insurance policy so that an average person in Horton's position could have understood Meridian's apparent intention to exclude employee "theft" from coverage. In addition, as discussed in *Kozak*, Meridian's intent regarding the policy exclusions is not controlling. The relevant inquiry is what kind of loss a reasonable insured would have understood the policy to cover and what kind of loss he should have understood the policy to exclude. While Meridian is correct that there are limits to how many terms an insurance company can defined before an insurance contract becomes overly voluminous, failing to define key terms may increase the risk that an insured will be unable to understand what losses are intended to be excluded from coverage.

12

Where an insurance policy is ambiguous, the "insured is entitled to all coverage he may reasonably expect to be provided under the policy...[and]... [o]nly an unequivocally conspicuous, plain and clear manifestation of the...intent to exclude coverage will defeat that expectation." *Simon v. Cont'l Ins. Co.*, 724 S.W.2d 210, 213 (Ky. 1986). In this case, the Court has found that the insurance policy is ambiguous. The exclusionary language does not plainly and clearly manifest Meridian's intention to exclude employee "thefts" from coverage. Because "thefts" generally are covered and Meridian does not dispute that a "theft" occurred, the Court finds that a reasonable person in Horton's position could not have anticipated that employee "thefts" would be excluded from coverage. Accordingly, the Court finds that Horton's loss is covered under Meridian's policy.

**B. Whether the "thefts" constituted a single occurrence for purposes of the deductible?**

Meridian alleges that even if this Court construes the insurance policy as providing coverage:

> cattle were wrongfully converted by the two employees over a period of time, and on multiple occasions, such that a separate deductible would apply to each incident of wrongful conversion or loss. If the Court determines that any coverage exists under the policy, the per loss or occurrence deductible amount of $1,000.00 should be applied to each unlawful taking of cattle.

Rec. 1, Complaint ¶ 31. Records from the stockyards indicate that Horton's employees sold the cattle on twenty-one separate occasions in 2007. Rec. 15, Exh. 4.

According to the Meridian policy, an occurrence is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results during the policy period: a. bodily injury; or b. property damage." Rec. 1, Exh. 1 Policy at 15. The deductible provision provides that "[w]e will not pay for loss or damage in any one occurrence

13

until the amount of the loss or damage exceeds the applicable deductible shown in the Declarations." *Id.* at 23. For livestock, the deductible amount is $1,000.00. *Id.* at 2.

In support of its position that the thefts constituted a single occurrence, Horton relies principally on the Third Circuit's decision in *Peco Energy Co. v. Boden*, 64 F.3d 852 (3d Cir. 1995). In *Boden*, the Third Circuit considered whether a series of thefts occurring over a six year period were one occurrence for purposes of a deductible or whether the full deductible applied to each separate theft. *Id.* at 855. The court explained that most courts "have looked to the cause or causes of the bodily injury or property damage" in answering this question. *Id.* at 856. Ultimately, the Third Circuit held that "when a scheme to steal property is the proximate and continuing cause for a series or combination of thefts, the losses for liability insurance purposes constitutes part of a single occurrence. *Id.*

Meridian does not dispute that a series of thefts as part of a continuing scheme would constitute one occurrence under its policy. However, Meridian asserts that Horton is not entitled to summary judgment on this issue because whether Horton's employees formed a single scheme to steal or made multiple independent schemes is a question of fact. In response, Horton argues that his former employees clearly had one scheme to steal and only sold the cattle on an incremental basis to aid them in avoiding detection.

In further support of his position, Horton cites the California Court of Appeal's decision in *Eott Energy Corp. v. Storebrand Inter. Ins. Co.*, 52 Cal. Rptr. 2d 894 (Cal. Ct. App. 1996). Having reviewed that decision, the Court finds that it does not support granting summary judgment on this issue at this time. In *Eott*, the Court explained that:

14

provided that EOTT can establish that there was a systematic and organized scheme to steal its diesel fuel products and that such scheme was the proximate cause of its $1.5 million loss, then there would only be a single occurrence subject to a single deductible of $100.000.  Certainly, this record discloses that evidence was presented by EOTT which demonstrates that material issues of fact exist on that point.  *The trial judge's determination to award summary judgment, even in the presence of an organized and systematic conspiracy, was error.*

*Id.* at 901 (emphasis added).  At this time, the Court has insufficient factual evidence in the record to determine as a matter of law whether Horton's former employees concocted one scheme to steal Horton's cattle, or whether as Meridian asserts they formed multiple independent schemes to steal.  As a result, the Court will not grant summary judgment on the deductible issue at this time.

### C. Whether Horton is entitled to prejudgment interest.

Where a federal court's jurisdiction rests on diversity of citizenship, Kentucky law governs this Court's consideration of whether prejudgment interest should be awarded.  *Estate of Riddle v. S. Farm. Bureau Life Ins. Co.*, 421 F.3d 400, 409 (6th Cir. 2005).  Under Kentucky law, prejudgment interest applies "as a matter of course" when damages are liquidated.  *Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136, 141 (Ky. 1991).  However, where a claim for damages is unliquidated, this Court has discretion to determine how much prejudgment interest should be awarded, if any, "as justice requires."  *Id.* at 144.

Distinguishing between liquidated and unliquidated claims is not always clear.  In *Nucor*, the Kentucky Supreme Court acknowledged that:

precisely when the amount involved qualifies as "liquidated" is not always clear, but in general "liquidated" means made certain or fixed by agreement of parties or by operation of law.  Common examples are a bill or note past due, an amount due on an open account, or an unpaid fixed contract price.

15

*Id.* at 141 (internal citations and quotations omitted).  On the other hand, unliquidated damages are those "[d]amages which have not been determined or calculated,...not yet reduced to a certainty in respect to amount."  *Id.* (quotations omitted).  The character of the damages is not affected by a dispute over liability, as a liquidated claim "may not be rendered 'unliquidated' by virtue of a good-faith denial of liability."  *Shanklin v. Townsend*, 434 S.W.2d 655, 656 (Ky. 1968)(per curiam).

Having reviewed the parties' arguments in support of their respective positions, the Court finds that Horton's claim is unliquidated.  It does not appear that the amounts claimed by Horton were fixed or made certain by agreement of the parties.  *Nucor*, 812 S.W.2d at 141.  Furthermore, Horton's claims are dissimilar to the examples of liquidated claims given by the Kentucky Supreme Court in *Nucor*.  *Id.* (explaining that common examples of liquidated claims include bills or notes past due, amounts due on open accounts or fixed contract prices).  Finally, while Meridian has indicated that it does not challenge Horton's valuation of his loss, the parties have given differing figures for the amount of Horton's loss and these figures may still be affected by the resolution of the deductible issue.

While the Court has found that Horton's claim is unliquidated, it recognizes that it may still award prejudgment interest if justice requires.  *Nucor*, 812 S.W.2d at 144.  The Court has found relatively few Kentucky decisions awarding prejudgment interest on unliquidated claims based on the interests of justice.  It appears that Kentucky courts rarely award prejudgment interest for "unliquidated" claims based on equitable considerations and where they do, allegations of bad faith are often involved.  *Ventas, Inc. v. HCP, Inc.*, 2009 U.S. Dist. LEXIS 106986, at *26 (E.D. Ky. 2009).  In this case, the Court will not award prejudgment interest on

16

equitable grounds because whether Horton is entitled to coverage under the Meridian policy represents a close question. Horton has not presented any evidence or made any allegations that Meridian's denial of coverage was the result of bad faith or that Meridian has unduly delayed these proceedings. As a result, the Court will not make an award of prejudgment interest at this time.

## IV.   CONCLUSION

For the reasons set forth above and the Court being sufficiently advised, it is **HEREBY ORDERED** that:

(1)    Plaintiff Meridian Citizens Mutual Insurance Company's motion for summary judgment (Rec. 14) is **DENIED;**

(2)    Defendant Stephen Horton's motion for summary judgment (Rec. 15) is **GRANTED IN PART**, to the extent that Horton's loss is covered under the Meridian insurance policy.

(3)    No prejudgment interest shall be awarded.

This 25th day of March, 2010.

**Signed By:**

**_Karen K. Caldwell_**

**United States District Judge**

17